# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00400-COA

SYLVIA DAVIS RESTER AND L.B. DAVIS          APPELLANTS

v.

GREENLEAF RESOURCES, INC.          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/03/2014 |
| TRIAL JUDGE: | HON. DAWN H. BEAM |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JACK PARSONS |
| | TADD PARSONS |
| | DAWN SMITH |
| ATTORNEY FOR APPELLEE: | MORAN M. POPE III |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| TRIAL COURT DISPOSITION: | REMOVED CLOUD FROM APPELLEE/DEFENDANT'S TITLE AND HELD THAT APPELLANTS/PLAINTIFFS FAILED TO ESTABLISH OWNERSHIP BY ADVERSE POSSESSION OF DISPUTED PROPERTY |
| DISPOSITION: | REVERSED AND REMANDED – 04/07/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., ISHEE AND CARLTON, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1. Plaintiffs Sylvia Davis Rester and L.B. Davis appeal from the Pearl River County Chancery Court's judgment where, after a bench trial, the trial court found that Sylvia and L.B. did not acquire title to 19.6 acres by adverse possession and, further, removed all clouds and quieted and confirmed title in favor of Defendant Greenleaf Resource Inc. (Greenleaf).

¶2.     Finding error, we reverse and remand.

FACTS

¶3.     On January 16, 2004, L.O. Crosby III conveyed, by warranty deed, a total of 297.61 acres of land located in Pearl River County, Mississippi, to Greenleaf.  Greenleaf recorded the deed from Crosby in the Pearl River County Chancery Clerk's office on January 20, 2004.  Included in the 297.61 acres is the 19.6-acre tract that is the subject of this suit (disputed property).  On November 9, 2012, siblings Sylvia and L.B. filed a complaint[1] alleging adverse possession of the 19.6 acres situated in the northwest quarter of the northeast quarter of the northeast quarter of northwest quarter of Section 2, Township 4 South, Range 14 West, Pearl River County, Mississippi, claiming that they, through tacking onto the claim of their father, Robert Davis, have owned of the 19.60-acre tract since 1919, when Robert acquired title to five acres of land located adjacent to the disputed property.  Greenleaf filed a counter-complaint to remove cloud and to quiet and confirm title to its entire land, which it argued included the disputed property.

¶4.     At trial, Herbert Gentry, a land manager for the Crosby property who served as a forester for the St. Regis Paper Company[2] from 1960 to 1982, testified that the general public referred to the disputed land as the "Rob Davis property."  Herbert explained that, as a forester, he was given a squatters list at the beginning of every year from the "surveyors and

---

[1] This is actually the second case filed by Sylvia and L.B.  In 2007, they filed an identical complaint against Greenleaf, but it had been dismissed for lack of prosecution.

[2] St. Regis had a timber purchase agreement with the Crosbys.

2

[Crosby's] land people," and he had been told not to touch lands that were listed. In addition, Herbert testified that every year he reported to the land owners the status of "all the adverse possession lands under [his] management." According to Herbert, the list included the disputed property. Herbert recalled that Robert kept the property fenced in and maintained the fence. He also recalled that a member of Robert's family cut timber and cleared the area after Hurricane Camille in August 1969, and the Crosbys did not object. He testified that he knew the squatters were serious about not having their land touched and, "[t]hey meant business. They meant stop at the fence." He did not recall anyone else claiming possession of this property during his tenure as a manager, nor did he recall being told to remove the Davises from the disputed property. Herbert also testified that he knew that the Crosbys owned the entire 70,000 acres of land he managed, and that they paid the taxes.

¶5.     James Myrick, a friend of the Davis family, testified that he had been familiar with the property since 1973. James testified that he visited the Davis family on the disputed property "hundreds" of times to swim, fish, and camp. He stated that his brother-in-law helped Sylvia's son, Donald Odom, repair barbed wire in places where the fence was "totally down" in the "late '80s, early '90s." James stated that he received permission from Sylvia on several occasions to take his son camping and fishing on the property, and no one ever asked him to leave the property when he was there. James testified that he believed that "Sylvia and her family" had control over the property, and that the disputed property is known as the "the Davis family" property in the community. James described how he saw

3

Herbert paint an orange line "on the outer property." He further stated that "the Crosby's business didn't do anything with [Davis family property]. They did [business] on the other side of its painted lines." During his cross-examination testimony, James was unsure whether the "swimming hole" where he used to swim and fish was located on the disputed property. James stated that he believed Sylvia's family had possession of the disputed property because there were houses on the property and Sylvia's family maintained the cemetery. James testified that he did not know that the Davises had title to the five acres adjacent to this disputed property where the cemetery was located.

¶6.     Arnold Smith testified that he worked for thirty years, and is now retired from his timber business in Poplarville, Mississippi. He stated that he knew the Davis family well because his mother and Sylvia's mother were sisters. He testified that he was familiar with the disputed property. Arnold also testified that he visited the property approximately a half dozen times about twenty years ago. He recalled that Robert, his uncle, had possession of the property at the time. He testified to seeing a corn field and a house on the land when Robert owned it, but he did not recall any livestock. He testified that there may have been a spring on the property. While Arnold initially testified that there was a house on the property; however, during his cross-examination testimony, he said he was "not real sure" whether the house was on the disputed portion of the property or not.

¶7.     Lanell Odom, age seventy-nine, testified that on one occasion in the 1980s, Sylvia requested that he cut timber off the property. Lanell testified that he paid Sylvia for the

4

timber. He further testified that during that one occasion, no one ever told him that he could not cut the timber off that land. Lanell stated that he used to go swimming and fishing at Wolf Creek stream, which runs close to the property. Lanell lived in the same community, which he called the Silver Run community, but moved away in the late 1980s. Lanell confirmed that he had never heard of anyone else owning or having interest in the property other than Sylvia and her family. Lanell opined that the Davises held themselves out as owning the property since they "let [him] cut timber" on it. He also recalled the fence around the property; however, he did not recall a house on the property. Lanell did not know whether the trees he cut down were on the disputed 19.6 acres or the five acres that the Davis family held the title to.

¶8. Hershel Ladner, age seventy-nine, testified that he was raised in the Silver Run community, just down the street from the Davises. He testified that when he was four or five, he visited the Davises often, and passed their house four or five times when he was "penning sheep" with his uncle. Hershel stated that he was a "double second cousin to Sylvia." He recalled crops being grown on the property, a house where the Davises lived, and a fence. Hershel stated that the last time he visited the property, which was for a funeral about ten to fifteen years ago, he did not see the house, fence, or crops. He never recalled anyone, other than the Davises, ever claiming that they owned the property at issue. He opined that the Davis family had owned that property for at least seventy-five years.

¶9. L.B. testified that he was eighty-eight years old, and that he left the Pearl River area

5

in 1955. He testified that he has a bachelor's degree in agricultural education and a master's degree in etymology from Mississippi State University. L.B. stated that in 1926, he was born in a log house that was located on the disputed portion of the property. L.B. further testified that the family lived on the property for about four years after he was born, and then moved away from the area for a few years. When they returned to the Silver Run community, they lived in their grandparents' house, which was located near the disputed property. He recalled that the family rented out their house for three or four years. The house was eventually torn down, according to L.B., by Sylvia and her first husband. L.B. also testified that his father planted corn, sweet potatoes, and sugar cane on the disputed property. L.B. stated that the area was fenced in, and he recalled helping his father re-fence the area in 1939 or 1940, before L.B. left for World War II. L.B. testified that his father passed away in 1966. He stated that no one else had claimed ownership of the disputed property until now. During L.B.'s direct examination, Greenleaf objected to testimony about a promise made to Robert by the Crosbys. Instead, L.B. proffered that Robert told him that Crosby was going to give Robert the title to the 19.6 acres, but never did.

¶10. Sylvia testified that her father had possession of the property from 1915 until he died. According to Sylvia, after her father died, she and her brother took possession of the 19.6 acres. She confirmed that her father and brother built a fence. She testified that in 1990 she replaced the fence, and has periodically paid people to repair the fence; however, she could not provide any receipts. Sylvia stated that the five acres that she and L.B. have acquired

6

actual title for is not included in the fenced-in area. She remembered growing watermelons, sweet potatoes, and cucumbers on the disputed property. She testified that she had sold timber from the disputed property twice. She stated that she has never lived on the property, and that no one has lived on the property since World War II. She explained that her son and husband have hunted on the property on occasion, and people used the land for other recreational uses. Sylvia also testified that she never spoke with the Crosbys concerning the disputed property.

¶11. Kent Robins testified he managed the Crosby property, and later the Greenleaf property, from 1982 to 2007. He testified that he had no reason to believe that the disputed property was not a part of the entire area of land he managed. Kent did not know about the squatters list that Herbert testified to. Kent stated that no one told him that this disputed property was not to be managed or touched because it was adversely possessed. Kent admitted that he did not "walk the property," but he explained that his "field" workers that had walked the property would have told him if there was something that would indicate someone else was using the land.

¶12. Edgar Vines, owner of Greenleaf, testified that the first time he found out about the adverse-possession claim was when he visited his property in 2006, after Hurricane Katrina. He testified that he saw a crew cutting timber on the disputed property. He saw a painted property line all the way around the property, including the five acres the Davises had title to. Edgar testified that he told one of the operators that the crew was on his property. Edgar

testified that after confronting the crew, he spoke with John Gunther, the owner of the tree-service company, and John explained to Edgar that he had received permission from Sylvia. According to Edgar, after informing John that he had the deed to the land, the crew left. Edgar also explained that he had a land survey completed, which did not find a continuous fence, a house, or crops on the disputed property. Edgar testified that L.B. called about the disputed portion of the property after the timber incident. Edgar asked L.B. if he had any record of his ownership, and L.B. stated that he did not but that his family owned the land. The following exhibits were admitted into evidence during trial: (1) a timber-cutting statement from John Guthrie; (2) general discovery by Sylvia and L.B.; (3) the warranty deed to Greenleaf; (4) a plat map; and (5) the land survey done for Greenleaf.

¶13.    On February 3, 2014, the trial court held that L.B. and Sylvia "failed to meet their burden of clear and convincing evidence as to more than one of the necessary elements of adverse possession . . . ," and that Greenleaf was entitled to immediate possession and occupancy of the disputed property. The trial court denied all other relief; however, it did not rule on Greenleaf's counter-complaint, which asked the court to remove all clouds and quiet title with respect to the entire 297.61 acres. Following the judgment, L.B. and Sylvia filed a motion to reconsider, and Greenleaf filed a motion to amend and correct the previous judgment. On March 27, 2014, the trial court denied the motion to reconsider, and granted Greenleaf's counter-complaint, and accordingly quieted and confirmed its title. This appeal ensued.

8

DISCUSSION

¶14.     L.B. and Sylvia assert that the trial court erred in finding that they did not provide

sufficient proof to establish title to the property through adverse possession.  Mississippi

Code Annotated section 15-1-13(1) (Rev. 2012) sets forth the requirements for a claim of

adverse possession:

> Ten (10) years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title, saving to persons under the disability of minority or unsoundness of mind the right to sue within ten (10) years after the removal of such disability, as provided in Section 15-1-7. However, the saving in favor of persons under disability of unsoundness of mind shall never extend longer than thirty-one (31) years.

¶15.    This Court has further provided that "[f]or possession to be adverse it must be (1)

under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4)

continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful. *See*

*Magee v. Garland*, 799 So. 2d 154, 157 (¶9) (Miss. Ct. App. 2001) (citing *Peagler v.*

*Measells*, 743 So. 2d 389, 390  (¶7) (Miss. Ct. App. 1999)). "The burden of proof is on the

adverse possessor to show by clear and convincing evidence that each element is met." *Id.*

"The question in the end is whether the possessory acts relied upon by the would[-]be

adverse possessor are sufficient to put the record title holder upon notice that the lands are

held under an adverse claim of ownership." *Id.*  "This Court will not disturb the factual

findings of the chancellor unless said factual findings are manifestly wrong or clearly

9

erroneous." *Nelson v. Bonner,* 13 So. 3d 880, 883 (¶4) (Miss. Ct. App. 2009) (citations omitted).

¶16.    After reviewing the record, we find that the trial court correctly considered the elements of adverse possession; however, it erred because it only focused on the period of time Greenleaf held title to the land. Specifically, the trial court erred when it held that "Greenleaf would have no way of knowing the Plaintiffs claimed ownership." We point out that Greenleaf did not hold title to the land until 2004, when it purchased the land from the Crosbys. Further inquiry is crucial in determining whether the Davis family adversely possessed the disputed property at any point prior to Greenleaf's purchase of the land.

¶17.    There are several ten-year spans of time, an element of adverse possession, that need to be considered, which the trial court's findings are silent on. Such a span begins with L.B.'s birth on the disputed property. There is testimony that the family maintained control by renting out the log cabin in their absence for a period of time. In addition, there was testimony that L.B. had worked on the fence in 1939. There is uncontradicted testimony from Herbert, who managed the property for over twenty years, that the property was on a squatters list, and that there were painted lines that were not crossed. In addition, he recalled that there was a fence, and that crops had been planted on the disputed property. Herbert's testimony is corroborated by L.B.'s testimony. James also testified to seeing the painted lines, which Herbert described and stated he did not cross in light of the fact that the land was on the squatters list. Several other witnesses testified about crops being grown by the

10

Davises on the disputed property and the Davises' recreational use of the land.

¶18.  We find that there was sufficient evidence produced to warrant further inquiry for the period of time prior to Greenleaf's purchase of the disputed land.  If at any point, the Davises had adversely possessed the property prior to Greenleaf's purchase, it follows that the title that Greenleaf received could not include the disputed property, notwithstanding the fact that it may lie within the calls of its deed.  To be clear, nothing in this opinion should be interpreted as holding or finding that the evidence is sufficient or insufficient to show that the Davises adversely possessed the property prior to the point in time when Greenleaf purchased it.  We simply hold that the trial court erred in limiting its focus to the period of time after the date of Greenleaf's purchase.

¶19.  **THE JUDGMENT OF THE CHANCERY COURT OF PEARL RIVER COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.**

11